1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL SANTOS WALTERS,                    No. C 14-4954 SI (pr)

        Plaintiff,                    **ORDER OF DISMISSAL WITH**
                                          **LEAVE TO AMEND**
        v.

DR. JOHN GRANT; et al.,

        Defendants.
_____/

## INTRODUCTION

Michael Santos Walters, a prisoner at San Quentin State Prison, filed a *pro se* civil rights action under 42 U.S.C. § 1983 complaining of conditions of confinement at the prison. His complaint is now before the court for review under 28 U.S.C. § 1915A.

## BACKGROUND

One of the themes of the complaint in this action is that prison medical officials' willingness to help Walters soured as they learned of his prior assaults on medical staff. Understanding Walters' claims is aided by a brief recitation of his custodial history before his arrival at San Quentin. Walters murdered a fellow inmate, apparently while in custody at Corcoran State Prison. *See* Docket # 2 at 4. He received an indeterminate SHU term for the killing, which he blames on custody staff. *Id.* He also "started to assault active gang members" after August 2011. *Id.* at 5. Walters also had assaulted medical personnel, as described in one of his medical records. Docket # 2-1 at 7. On June 28, 2010, Walters "'got up out of the wheelchair and walked around the table without assistance. He jumped on top of Dr. Huang and knocked him out of his chair and started beating him with his hands which were restrained in

United States District Court
For the Northern District of California

waist chains.'" *Id.*  Another doctor recounted that, on another occasion, Walters "'took three quick steps and tried to take a swing at me with his waist chain with his left hand.  He ended up hitting my left elbow.  Corrections was quick enough to restrain him and place him back in the holding tank.'"  *Id.*  Walters also had assaulted a nurse.  Docket # 1 at 5.

The complaint alleges the following:

When Walters was at CSP-Corcoran, Dr. McCabe allegedly began retaliating against him after he filed a grievance because custody staff had taken away his "medical devices" after he assaulted a nurse.  *Id.*  He appears to believe this was retaliatory because the assault was accomplished "without any personal or medical property ever being used whatsoever."  *Id.*  Several medical devices (including a pressure mattress, wheelchair cushion, TENS unit, orthopedic boots, arch supports, braces for back and knees, and a walker) were taken by Corcoran correctional staff.  "Dr. McCabe's reason was if I can assault staff I don't need medical treatment."  *Id.*  As a result of the confiscation of his walker and braces, Walters fell.  He sought treatment numerous times at Corcoran, but Dr. McCabe prevented him from getting the items back.  *Id.* at 5-6.

Walters left Corcoran on June 25, 2013, and was transferred to San Quentin, where he was placed in the Adjustment Center.  *See* Docket # 1 at 6.  He does not allege that he is a death row inmate, but that appears to be the case because the Adjustment Center houses a subset of the death row population.  *See* 15 Cal. Code Regs. § 3349.1.1 ("Adjustment Center means one of four housing units at San Quentin State Prison that houses condemned inmates who are placed under administrative segregation based on their custodial behavior, notoriety and/or protective needs").  Walters arrived with a history of "incomplete quadriparesis" (i.e., weakness in all limbs), cervical spine surgeries, and lumbar spine surgeries.  Docket # 2 at 2-3.

On or about July 12, 2013, Walters saw Dr. Grant and complained that the Adjustment Center did not comply with the ADA.  His main issues were that the "food/cuff port [was] shorter than standard food/cuff port," the toilet was "not ADA regulation," and the Adjustment Center policy limiting inmate clothing to boxers and shirts made it unacceptably cold, especially due to the medical hardware in Walters' back and neck, plus his numb skin.  *Id.* at 2.  Walters

2

United States District Court
For the Northern District of California

also was without some of his medical appliances, e.g., a drop-toe brace that held his ankle steady and a locking hinge knee brace that had been taken from him at CSP-Corcoran.  Over the next several months, Dr. Grant saw Walters several more times and gathered information about Walters' history to determine the accommodations appropriate for him.  Accommodations were not provided during those months.

On or about December 27, 2013, Dr. Grant told him that he was scheduled for the Interdisciplinary Treatment Team on January 8, 2014, and in the meantime Dr. Grant would continue to gather information to assess Walters' needs.  Walters told Dr. Grant he would be willing to go to the outpatient housing unit, but Dr. Grant told him "it was no longer on the table, as he has spoke to Dr. McCabe and other doctors in CSP-Corcoran whom retaliated on me for filing an appeal and/or assaulting medical personal!"  *Id.* at 3 (error in source).

A few days later, Walters received a chrono in which Dr. Grant discontinued Walters' "waistchain chrono and specifically wrote for palms-in cuffing."  *Id.* at 3-4.

The Interdisciplinary Treatment Team ("IDTT") convened on January 8, 2014.  Dr. Grant met with Adjustment Center administrators for about 15 minutes before Walters entered the meeting.  By the time Walters entered, the defendants present were already biased against him "for filing ADA accommodations request (inmate grievances), coupled with Dr. Grant's prejudiced medical opinion due to past assaults after speaking with Dr. Gill and CMO, Dr. Connell McCabe at CSP-Corcoran."  *Id.* at 4.  Walters submitted "contradictory evidence to the retaliatory professional opinion," but the IDTT members were unpersuaded.  *Id.*[1]  Dr. Grant said that no accommodations would be made.  *Id.*

On or about January 17, 2014, Dr. Grant told Walters that "if I can assault doctors he sees no need for medical assistance."  *Id.* at 6.

Walters has not received the needed accommodations of a higher food/cuff port or

---

[1]Walters referred to Exhibits A-F and marked his exhibits only by putting a very small letter at the top left corner of some of the pages of his exhibits.  The exhibit letters cannot be read when the document is stapled.  Walters must mark his exhibits much more clearly in the future by either (1) writing the letter or number of the exhibit in large print at the bottom of the center of the first page of the exhibit, or (2) putting a blank page in front of each exhibit and writing the exhibit letter or number clearly on that otherwise blank page.

United States District Court
For the Northern District of California

accessible shower.   Docket # 1 at 8.   Dr. Grant at first wrote that these and other accommodations were appropriate, and only changed his mind after learning about Walters' assaultive history.  *See* Docket # 1 at 8-11.

Walters also claims that he should not have been housed in the Adjustment Center with known active Mexican Mafia members or associates who had vowed to kill him.  *See* Docket # 2 at 5.  Since April 30, 2002, he had been "in non-active housing units except in August 2011 when [he] was placed in an active unit with hopes [he] would be assaulted."  *Id.*  He lasted a year with no rule violation reports and requested to return to a non-active housing unit but his requests were denied "until [he] started to assault active gang members."  *Id.*  His other allegations about Adjustment Center housing are somewhat unclear, and it is unclear who made the housing decisions.

In or around April-May 2014, officer Ramirez of the San Quentin investigative services unit did a threat assessment and determined that it was best for Walters to see another doctor, so Dr. Allison Pachynski was assigned as his new primary care provider.  *See id.* at 6.  He apparently saw her only three times, before chief physician and surgeon Lisa Pratt and chief medical officer Elaina Tooltell returned him to having Dr. Grant as his primary care provider.  Dr. Pratt signed off on the inmate appeal but never interviewed him.  CMO Tootell signed off at the second level.

On an inmate appeal in about April or May 2014, regarding the 12-inch step into the shower, lieutenant Schlosser informed him that "'the hinge that squeaks gets the grease,'" and got officer Feneka to falsely state that Walters had no trouble "navigating into the shower."  *Id.*

Sometime around May 2014, Walters was put in the enhanced outpatient level of mental health care.  He attended groups for about a month, but those were stopped by custody due to safety and security concerns.  He filed an appeal on September 11, 2014, and "in retaliation custody asked a mental health doctor not on plaintiff's case load to observe him and write a CDC128-b.  On September 26th this took place in retaliation for filing an inmate grievance because custody cancelled my groups in the CHSB 2nd floor as I cannot navigate the stairs on the 3rd tier of the AC.  Again in retaliation for filing these appeals a supervisor ordered C/O D.

1   Johnson to count everything I do as it pertains to working out.  He asserts plaintiff did 102

2   pullups and 6 leg lifts in 38 minutes." *Id.* at 7.

3       On October 15, 2014 and October 21, 2014, custody defendant(s) told Dr. Grant to take

4   away Walters' chronos for a wheelchair and "no stairs" in retaliation for the inmate appeals. *Id.*

5       Walters has a suprapubic catheter.  Docket # 1 at 7.  In December 2013 and January 2014,

6   Drs. Grant, Pratt and Tootell "were aware of an angry infection" which Walters had for about

7   fifteen months. *Id.*  Dr. Grant gave him "antibiotics for only 7 days rather than 10-14 days which

8   has caused a lot of pain & discomfort by continuing to give antibiotics for only 7 days with a

9   minimum of 7 rounds of antibiotics so that I cannot get rid of the infection but also so I get

10  immune from them so I will get resistant and they will no longer work." *Id.* at 11.  An

11  unidentified person gave Walters lidocaine jelly instead of the Vicodin ordered by the urologist

12  for pain medication on some unspecified date.  *Id.*

13

14                                      **DISCUSSION**

15  A.    Review Of Complaint

16      A federal court must engage in a preliminary screening of any case in which a prisoner

17  seeks redress from a governmental entity or officer or employee of a governmental entity.

18  *See* 28 U.S.C. § 1915A(a).  In its review the court must identify any cognizable claims, and

19  dismiss any claims which are frivolous, malicious, fail to state a claim upon which relief may

20  be granted, or seek monetary relief from a defendant who is immune from such relief.  *See id.*

21  at § 1915A(b)(1),(2).  *Pro se* pleadings must be liberally construed.  *See Balistreri v. Pacifica*

22  *Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

23      To state a claim under 42 U.S.C. § 1983, a plaintiff must allege two elements:  (1) that

24  a right secured by the Constitution or laws of the United States was violated and (2) that the

25  violation was committed by a person acting under the color of state law. *See West v. Atkins*, 487

26  U.S. 42, 48 (1988).

27      There are several problems with the complaint that make it necessary for Walters to file

28  an amended complaint.  One overarching problem is that he actually filed two separate

*United States District Court*
For the Northern District of California

complaints (Docket # 1 and # 2) that have overlapping, but not identical claims.  The documents have an excessive amount of argument in them, when they should be devoted to stating the facts in support of his claims.  Walters may file only one amended complaint; that amended complaint must be a complete statement of his claims and must cure the deficiencies identified in this order.

> 1.     ADA and RA

Title II of the Americans With Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA"), and § 504 of the Rehabilitation Act, as amended and codified in 29 U.S.C. § 701 *et seq.* ("RA"), prohibit discrimination on the basis of a disability in the programs, services or activities of a public entity.  Federal regulations require a public entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."   28 C.F.R. § 35.130(b)(7).  "A public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs or activities."  28 C.F.R. § 35.130(h).

The elements of a cause of action under Title II of the ADA are: (1) the plaintiff is an individual with a disability; (2) the plaintiff is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.  *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir. 2002).[2]  A cause of action under § 504 of the RA essentially parallels an ADA cause of action.  *See Olmstead v. Zimring*, 527 U.S. 581, 590 (1999); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001).

---

[2]Monetary damages are not available under Title II of the ADA absent a showing of discriminatory intent.  *See Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir. 1998).  To show discriminatory intent, a plaintiff must establish deliberate indifference by the public entity.  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).  Deliberate indifference by the entity requires: (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood.  *Id.* at 1139.

United States District Court
For the Northern District of California

The proper defendant for a claim under Title II of the ADA and § 504 of the RA is the public entity responsible for the alleged discrimination. *See Everson v. Leis*, 556 F.3d 484, 501 & n.7 (6th Cir. 2009) (collecting cases). *But cf. Eason v. Clark County School Dist.*, 303 F.3d 1137, 1145-45 (9th Cir. 2002) (declining to decide the issue). Title II of the ADA does not provide for suit against a public official acting in his individual capacity. *Everson*, 556 F.3d at 501. A plaintiff also cannot assert a claim under § 1983 against defendants in their individual capacities to vindicate rights created by the ADA and RA. *See Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002).

Walters has not identified a proper defendant. Here, the proper defendant for an ADA and RA claim would be the CDCR or the prison as the entity that allegedly denied Walters his rights under the ADA and RA. In his amended complaint, he must name a proper defendant, such as the CDCR or San Quentin State Prison or the chief medical officer of that prison "in his official capacity." *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (suit against a person in his official capacity is considered to be a suit against the entity of which the officer is an agent).

Walters also must be clearer in his amended complaint about the accommodations not provided. If he wishes to assert a cause of action under Title II of the ADA and the RA, Walters needs to name a proper defendant, identify his disabilities for which accommodation was sought, and list the modifications and accommodations that were not provided.

2.   Retaliation

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

Walters contends that defendants violated his First Amendment right to be free from retaliation by taking "his medical appliances and chronos" and keeping him in the Adjustment

Center with known enemies who pose a danger to him.  Docket # 1 at 17.  Even with liberal construction, the complaint does not state a retaliation claim.

A critical requirement of a § 1983 retaliation claim is that the adverse action be taken because of the prisoner's protected conduct.  Walters' complaint plainly alleges that his prior assaultive conduct toward medical staff played a substantial role in causing defendants to deny him needed medical care and ADA accommodations.  Walters repeatedly alleges that his adverse treatment was in retaliation for his appeals and past assaults on doctors.  Docket # 1 at 7; *see also id.* at 3 (the doctors "are retaliating on the plaintiff for filing health care inmate grievance(s), American With Disabilities Act Grievances and for past assaults on medical staff"); *id.* ("Dr. Grant with the blessing of doctors Tooltell and Doctor Pratt has been allowed to retaliate on this plaintiff because of past assaults on medical staff"); *id.* at 10 ("This doctor's change of heart isn't based on evidence-based clinical guidelines, rather it is based on retaliation after he spoke with doctors whom I've assaulted or tried to if you see the time line and how the plaintiff's discrimination towards him started"); *id.* at 11 ("The retaliation was originated in Corcoran by ISU officers . . . and Doctor McCabe for writing the grievance coupled with the staff assault"); Docket # 2 at 3 (outpatient housing unit was made unavailable to him after Dr. Grant stated that "he has spoke to Dr. McCabe and other doctors in CSP-Corcoran whom retaliated on me for filing an appeal and/or assaulting medical person[nel]!").  The picture painted by the complaint and exhibits is of an unusually dangerous prisoner prone to attacking medical staff – and it was that information that drove the defendants' conduct.  That does not demonstrate the sort of retaliation for which § 1983 provides a remedy.  *See generally Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (notwithstanding plaintiff's claim that he was reclassified in retaliation for his civil rights action, the reclassification of plaintiff for his misbehavior did not amount to retaliation because it served the legitimate penological purpose of maintaining prison discipline).  It is pure speculation by Walters that his inmate grievance activity rather than his assaultive conduct prompted the allegedly poor treatment by medical staff.  There also is no allegation suggesting that the adverse decisions had any chilling effect on the exercise of Walters' First Amendment rights.  The medical staff's treatment at the Adjustment Center may have made him

United States District Court
For the Northern District of California

1  think twice about attacking another medical care provider, but attacking medical care providers

2  is not a First Amendment right.[3]  The retaliation claim is dismissed.

3        With regard to Walters' continued retention in the Adjustment Center, he has not alleged

4  who made that housing decision and has not alleged facts suggesting that it was done in

5  retaliation for his constitutionally protected activities instead of in response to his assaultive

6  behavior.  Walters's allegation that he had received an indeterminate SHU term for killing

7  another inmate suggests he fit within the criteria for placement in the Adjustment Center.  His

8  assaultive behavior also suggests that he fit the criteria for placement in the Adjustment Center.

9  This part of his retaliation claim is dismissed with leave to amend.  In his amended complaint,

10  Walters must link individual defendants to the claim, and must allege facts suggesting that his

11  retention in the Adjustment Center was done in retaliation for his inmate grievance filing

12  activities rather that for his assaultive conduct – as only the former is constitutionally protected

13  activity.  Plaintiff is cautioned that retaliation is not established simply by showing adverse

14  activity by a defendant after protected speech; rather, he must show a nexus between the two.

15  *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest

16  on the logical fallacy of *post hoc, ergo propter hoc*, i.e., "after this, therefore because of this");

17  *see also Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 901 (9th Cir. 2008) (finding no

18  retaliation where plaintiff presented no evidence that defendants gave her a traffic citation after

19  reading a newspaper article about her First Amendment activities, rather than because she drove

20  past a police barricade with a "road closed" sign on it).

21

22       3.    <u>Deliberate Indifference To Medical Needs</u>

23        Deliberate indifference to a prisoner's serious medical needs amounts to the cruel and

24  unusual punishment prohibited by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104

25

26  _____

27       [3]This is not to suggest that health care providers are free to ignore a prisoner's medical and ADA rights based on his past behavior.  Health care providers still might be liable under the Eighth Amendment for the medical care or lack of it.  The governmental entity still might have

28  liability under the ADA or RA for failing to provide reasonable modifications to a disabled prisoner.

United States District Court
For the Northern District of California

1   (1976). A prison official violates the Eighth Amendment only when two requirements are met:

2   (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is,

3   subjectively, deliberately indifferent to the inmate's health. *See Farmer v. Brennan*, 511 U.S.

4   825, 834 (1994). For the objective prong of the deliberate indifference test in a medical care

5   claim, the plaintiff "must show a serious medical need by demonstrating that failure to treat a

6   prisoner's condition could result in further significant injury or the unnecessary and wanton

7   infliction of pain." *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citation and

8   internal quotation marks omitted). For the subjective, or "deliberate indifference" prong, the

9   plaintiff must show "(a) a purposeful act or failure to respond to a prisoner's pain or possible

10   medical need and (b) harm caused by the indifference." *Id.* (citation and internal quotation

11   marks omitted).

12      Walters has not adequately alleged a claim for deliberate indifference to his serious

13   medical needs. In his amended complaint, Walters must identify what his serious medical need

14   was, and must allege what each defendant did or failed to do that amounted to deliberate

15   indifference to that serious medical need. He also must state the dates on which the defendants

16   acted or failed to act so as to provide fair notice to each named defendant of the claims against

17   him or her. (Unlike the ADA/RA claim above, the deliberate indifference claim must be alleged

18   against individuals rather than against the prison or the CDCR.)

19      With regard to the use of a 7-day rather than a 14- or 21-day course of antibiotics and the

20   choice of lidocaine jelly over Vicodin, Walters' allegations suggest nothing more than a

21   difference of opinion with his medical care providers. "A difference of opinion between a

22   prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983

23   claim." *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981); *see also Toguchi v. Chung*,

24   391 F.3d 1051, 1058-60 (9th Cir. 2004) ("[T]o prevail on a claim involving choices between

25   alternative courses of treatment, the prisoner must show that the chosen course of treatment 'was

26   medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an

27   excessive risk to the prisoner's health'"). If he wants to pursue claims based on these facts, he

28   needs to allege facts showing something more than a difference of opinion and must link

1    individual defendants to the claims.

2        If plaintiff wants to claim that the denial of some of the ADA-related assistive devices

3    amounted to deliberate indifference to his medical needs, he needs to clearly allege that.  For

4    each such instance, he needs to allege what serious medical need was to be addressed by an

5    assistive device (e.g., explain for what medical condition a pressure mattress was needed), state

6    when it was denied, and state by whom it was denied.  He also needs to allege facts suggesting

7    that the defendant knew of and disregarded an excessive risk to his health in denying the device.

8        For all his claims (other than the ADA and RA claims), the amended complaint must

9    allege facts showing the basis for liability for each defendant for each claim.  Walters should not

10   refer to them as a group (e.g., "the defendants"); rather, he should identify each involved

11   defendant by name and link each of them to his claim by explaining what each involved

12   defendant did or failed to do that caused a violation of his rights.  *See Leer v. Murphy*, 844 F.2d

13   628, 634 (9th Cir. 1988).  There is no respondeat superior liability under Section 1983, i.e. no

14   liability under the theory that one is responsible for the actions or omissions of an employee.

15   Liability under Section 1983 arises only upon a showing of personal participation by the

16   defendant.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  A supervisor may be liable

17   under § 1983 upon a showing of (1) personal involvement in the constitutional deprivation or

18   (2) a sufficient causal connection between the supervisor's wrongful conduct and the

19   constitutional violation.  *See Starr v. Baca*, 652 F.3d 1202, 1206-07 (9th Cir. 2011).

20

21       4.    Deliberate Indifference To Safety

22       The Eighth Amendment's prohibition of cruel and unusual punishment also requires that

23   prison officials take reasonable measures for the safety of inmates, including protecting inmates

24   from violence at the hands of other inmates.  *See Farmer v. Brennan*, 511 U.S. at 833-34.  The

25   elements parallel a deliberate indifference to medical care claim.  That is, (1) a substantial risk

26   of serious harm must exist, and (2) the prison official must both be aware of facts from which

27   the inference could be drawn that a substantial risk of serious harm exists and draw the

28   inference.  *See id.*

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Walters does not adequately allege a claim against any defendant for deliberate

2  indifference to his safety.  It is unclear from the complaint who decided that Walters should

3  remain in the Adjustment Center and whether he/she/they knew that remaining there posed a

4  substantial risk of serious harm.  In his amended complaint, Walters must link one or more

5  defendants to his claim that he improperly was kept in the Adjustment Center with Mexican

6  Mafia inmates by alleging both a serious risk to his safety and deliberate indifference to that risk

7  by one or more defendants.

8

9        5.    Due Process - Inmate Appeals

10    There is no federal constitutional right to a prison administrative appeal or grievance

11  system for California inmates.  *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003); *Mann*

12  *v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988); *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir.

13  1996) (prison grievance procedure is procedural right that does not give rise to protected liberty

14  interest requiring procedural protections of Due Process Clause); *Smith v. Noonan*, 992 F.2d 987,

15  989 (9th Cir. 1993).  Prison officials are not liable for a due process violation for simply failing

16  to process an appeal properly, denying an inmate appeal or granting an inmate appeal.

17    Walters contends that Dr. Lisa Pratt "violated [his] due process by not interviewing [him]

18  for an inmate appeal."  Docket # 1 at 6.  Instead, she "simply would reiterate what [he] already

19  wrote rather than interviewing [him]." *Id.*  Walters also alleges that Elaina Tootell signed the

20  inmate appeal at the next level.  Given that there is no due process right to a properly functioning

21  prison appeal system, a § 1983 claim for a due process violation is not stated against any

22  defendant.   The due process claim is dismissed without leave to amend.

23    The defendants' responses to Walters' inmate appeals are not wholly irrelevant, however.

24  They may be the basis for liability for an ongoing Eighth Amendment violation.  For example,

25  if a defendant only denied an inmate appeal about a medical problem that already had occurred

26  and been resolved, there would be no liability for a constitutional violation; however, where the

27  problem is an ongoing medical need and the request is made in an inmate appeal to remedy the

28  ongoing problem, liability can be based on the denial of an inmate appeal, just as it could be

12

1    based on the denial of a verbal request from the inmate.  *Cf. Jett v. Penner*, 439 F.3d 1091, 1098

2    (9th Cir. 2006) (supervisor may be liable for deliberate indifference to a serious medical need,

3    for instance, if he or she fails to respond to a prisoner's request for help).

4

5    B.      Miscellaneous Matters

6            Walters has requested that counsel be appointed to assist him in this action.  A district

7    court has the discretion under 28 U.S.C. §1915(e)(1) to designate counsel to represent an

8    indigent civil litigant in exceptional circumstances.  *See Wilborn v. Escalderon*, 789 F.2d 1328,

9    1331 (9th Cir. 1986).  This requires an evaluation of both the likelihood of success on the merits

10   and the ability of the plaintiff to articulate his claims pro se in light of the complexity of the legal

11   issues involved.  *See id.*  Neither of these factors is dispositive and both must be viewed together

12   before deciding on a request for counsel under § 1915(e)(1).  Here, exceptional circumstances

13   requiring the appointment of counsel are not evident.  The request for appointment of counsel

14   is DENIED.  (Docket # 3.)

15           Plaintiff sent a summons to the court and asked if it had been served.  A summons will

16   not be served on any defendant unless and until the court orders service of process, and the court

17   will not order service of process until it finds that plaintiff's complaint or amended complaint has

18   stated a claim upon which relief may be granted.  Here, plaintiff must file an amended complaint,

19   and the court will not know until it reviews that document whether to order service of process.

20   Additionally, it is unnecessary for plaintiff to send in a summons in the Northern District;

21   although it may be different in other districts, the clerk in this district generally will prepare the

22   summonses for the Marshal to serve when a *pro se* prisoner is proceeding *in forma pauperis.*

23   /   /   /

24

25

26

27

28

United States District Court
For the Northern District of California

13

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### CONCLUSION

Plaintiff's complaint is dismissed with leave to amend.  Plaintiff must file an amended complaint no later than **March 27, 2015**, and must include the caption and civil case number used in this order and the words AMENDED COMPLAINT on the first page. Plaintiff is cautioned that his amended complaint must be a complete statement of his claims.  *See Lacey v. Maricopa County*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc).  Failure to file an amended complaint by the deadline will result in the dismissal of this action.

IT IS SO ORDERED.

Dated: February 12, 2015

_____
SUSAN ILLSTON
United States District Judge